UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **STEPHEN A. FRANKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 2:14-cv-00021** |
| **v.** | ) | **Judge Sharp** |
| | ) | **Magistrate Judge Newbern** |
| **NANCY BERRYHILL,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF OPINION

Pending before the Court is Plaintiff Stephen A. Franks' ("Franks") Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 16), filed with a Memorandum in Support (Doc. No. 17). Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Franks' Motion (Docket No. 19). This case was referred to Magistrate Judge Newbern, but the Court hereby withdraws that referral. In addition, upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 11),[1] and for the reasons given below, the Court will **DENY** Franks' Motion.

### I.    Introduction

On November 8, 2010 Franks filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act, alleging a disability onset of July 15, 2010. (A.R. 40.) Franks' claim was denied at the initial and reconsideration stages of state agency review. Franks subsequently requested *de novo* review of his case by an Administrative Law Judge ("ALJ").

---

[1] Referenced hereinafter by page number(s) following the abbreviation "A.R."

The ALJ heard the case on June 6, 2012, when Franks appeared, was represented by an attorney, and gave testimony. (Id. at 54.) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the matter was taken under advisement until June 22, 2012, when the ALJ issued a written decision finding Franks not disabled. (Id. at 40.) That decision contains the following enumerated findings:

1. Franks meets the insured status requirements of the Social Security Act through December 31, 2014.

2. Franks has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. Franks has the following severe impairments: mood disorder with psychosis that is in remission (20 C.F.R. 404.1520(c) and 416.920(c)).

4. Franks does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Franks has no physical limitations to the residual functional capacity ("RFC") to perform work as defined by 20 C.F.R. 404.1567(c) and 416.967(c). He is in a regular day treatment program at the mental health center and is limited to shift work. He is limited to unskilled work, involving no detailed or complex work instructions. He can tolerate no more than occasional interaction with supervisors, coworkers, or the general public.

6. Franks can perform past relevant work as a material handler, DOT #929.687-030. This work does not require the performance of work-related activities precluded by his RFC, as the vocation expert testified (20 C.F.R. 404-1565 and 416.965).

7. Franks has not been under a disability within the meaning of the Social Security Act from July 15, 2010 through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

(Id. at 42–49.)

On December 24, 2013, the Appeals Council denied Franks' request for review of the ALJ's decision, thereby rendering that decision the final decision of the SSA. (Id. at 4.) This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II.     Review of Record

The following summary of Franks' medical record is taken from the ALJ's decision.

(A.R. 45–48.)

> [Franks] was involved in a court-ordered behavioral health treatment program from July 7 to December 16, 1998; however he failed to follow-up with treatment after August 20, 1998. A psychiatric evaluation performed on May 9, 2000, indicated that he had been hospitalized four times for suicidal ideation and difficulty with anger control. His GAF at that time was estimated at 52, consistent with moderate symptoms . . . He was hospitalized from August 9 to August 17, 2001. Inappropriate behavior has resulted in the hospital admission, with discharge diagnoses noted for bipolar disorder mixed with psychotic features, and pedophilia. . . . At his discharge his GAF was 65, indicating some mild symptoms but generally functioning pretty well . . . A psychiatric update on August 30, 2011, indicated a history of bipolar disorder, rule out schizoaffective disorder and PTSD (posttraumatic stress disorder). His GAF at that time was 40, consistent with serious symptoms and some impairment in reality testing or communicating. He was in a treatment program and said he was compliant with his medication regimen. He began a three-day program on December 18, 2011, to stabilize him and adjust his medications.
>
> At the time of his psychiatric hospital admission on November 15, 2003, [Franks] was exhibiting psychotic behavior. He was agitated and delusional, and appeared to attend to internal stimuli, talking and laughing inappropriately. He was not compliant with medication. He had been put on involuntary commitment. Although he attended school through the 12th grade, he was in special education classes. He had loose associations, but was able to focus for short periods. He insisted he was the President of the United States, and gave his name as the current President, although he was able to name the first President. His memory appeared good, but his insight and judgment were poor. It was questionable whether he could live independently. The diagnosis included psychosis NOS, rule out opiod abuse; and chronic mental illness with history of child molestation. His GAF was unclear but estimated at 18, indicating some danger to himself or others . . . He was discharged on November 21, 2003. . .
>
> [Franks] has gotten into some trouble with his landlord when he was hospitalized on March 17, 2004, having chopped down all the trees in his back yard. His recent and remote memory was impaired. His thought processes were evasive and very

guarded, and thought content showed extreme paranoia and delusions. His insight, judgment and impulse control were poor. He was placed on Risperdal and slowly responded. At the time of discharge he had no hallucinations or delusions, his sleep and appetite were improved, and his concentration was improved. The discharge diagnoses included schizophrenia, chronic paranoia type; noncompliance with medication, and chronic mental illness. Admission GAF was 20, consistent with some danger to himself or others. The GAF at discharge was 60, indicating moderate symptoms. . . He was discharged on March 29, 2004. He was in the care of the mental health center from 2004 to June 2006 when he moved out of that area. He remained stable but was marginally compliant with medication.

There is no evidence that [Franks] sought or received medical treatment from any physician, hospital or mental health center from June 2006 until November 2009, when he stated that he began treatment at the mental health center. . . When he was examined by George Stanford, MD, the psychiatrist, his chief concern was being unable to find a job . . . His mood was euthymic and his affect constricted. He had very literal interaction on the affective level as well as the cognitive level. The diagnoses included mood disorder NOS, history of psychosis NOS, and the GAF was estimated at 65, consisted withy mild symptoms and/or limitations . . . He was nearly out of medication and he was given renewals of his prescriptions; he was advised to got to vocational rehabilitation for help in finding work. He underwent assessment at the vocational rehabilitation service on March 4 to March 30, 2004; his score on aptitude testing were negatively affected by his slow speed. Still, he was considered suitable for work as a groundskeeper, law service worker, landscape laborer, construction worker, sanitation worker, janitor/cleaner, material handler and machine operator. At the mental health center on April 26, 2010, he repotted short episodes of hypomanic or manic symptoms with grandiosity and elevated mood. His mood was euthymic and affect matter-of-fact; his speech was clear. His though demonstrated convoluted process but there was no flight of idea or similar patterns. Insight and social judgment were fair. The GAF was estimated at 52, consistent with moderate symptoms. . . He was still looking for a job but said he was no depressed. No changes were noted in mental status examination, but his GAF was improved at 58 . . . He had lost his job again on September 23, 2010, and was in the Cedar House program. He was considered doing well, with GAF of 52, consistent with moderate symptoms. His insight and social judgment remained fairly good.

On December 9, 2010, [Franks] returned to the mental health center for psychiatric assessment and treatment, his mood

was more euthymic but his affect showed obsessional components and worry. His speech was clear and his thoughts well organized. The diagnoses included mood disorder NOS with history of psychosis NOS that was not evident. His GAF was estimated at 55, consistent with moderate symptoms and/or limitations . . . He was advised to consult his primary care physician about some of his medication.

Bonnie L. Atkinson, PhD performed a consultative psychological evaluation in March 30, 2011. [Franks] complained of schizophrenia, said he saw and heard things that were not there, and was unable to stay on task on a job. He reported having anger problems with staff and coworkers on a job. He had graduated from high school but was is special education classes. He has last worked for two months in 2010 as a groundskeeper, and was let go allegedly because he could not properly use the equipment. His longest job lasted three years. He had a history of three arrests; one from criminal mischief, one for assault and one for pedophilia. . . . He said he had no history of psychiatric hospitalizations, which is not consistent with those discussed above. Orientation was appropriate, and [Franks'] concentration was normal. He could subtract serial sevens, count to 20, spell the word "world" backwards, name opposites and reason well, but he could not interpret a simple proverb. His language comprehension was fair and his speech was clear. His memory was intact. His intelligence was estimated in the average range. His affect was flat and his mood depressed. He reported sleep disturbance due to racing thoughts. Occasional hallucinations were noted. He could prepare meals, dust, and do dishes. He did not perform routine self-care activities independently because he had to wait to be told. The diagnoses included schizotypal; anxiety disorder, atypical; history of psychotic disorder . . . [Franks] was considered seriously mentally ill but not retarded.

### III. Conclusions of Law

#### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting

Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)).  In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight."  Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)).  The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion.  See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility."  Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)).  Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record."  Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

### B. Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  The SSA considers

a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit

Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of

Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant

bears the burden through step four of proving the existence and severity of the limitations her

impairments cause and the fact that she cannot perform past relevant work; however, at step five,

"the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy

that accommodate the claimant's residual functioning capacity[.]" Kepke v. Comm'r of Soc.

Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d

387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the

Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional

impairment does not significantly limit the claimant, and then only when the claimant's

characteristics precisely match the characteristics of the applicable grid rule. See Anderson v.

Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611,

615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

## C. Weighing Medical Source Evidence

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011). The significant deference accorded to the Commissioner's decision is conditioned on the ALJ's adherence to these governing standards. In Gentry v. Commissioner of Social Security, the Sixth Circuit re-stated the responsibilities of the ALJ in assessing medical evidence in the record in light of the treating source rule:

> Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. The second is known as the "treating physician rule," see Rogers, 486 F.3d at 242, requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported

> by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012). The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. Rogers, 486 F.3d at 242. In all cases, the treating physician's opinion is entitled to great deference even if not controlling. Id. The failure to comply with the agency's rules warrants a remand unless it is harmless error. See Wilson, 378 F.3d at 545–46.

741 F.3d 708, 723 (6th Cir. 2014).

The Sixth Circuit has also made clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—*i.e.*, "cherry-picking" it—to avoid analyzing all the relevant evidence. Id. at 724 (citing Minor v. Comm'r of Soc. Sec., 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports.")). This is particularly so when the evidence ignored is from a treating physician. Ignoring medical evidence from a treating source in fashioning the RFC, without a proper analysis of why such action is taken, cannot be harmless error because it "undermines [the ALJ's] decision" to overlook evidence that could have potentially supported a more restrictive RFC or even a finding of disability. Gentry, 741 F.3d at 729 (citations omitted); Grubbs v. Comm'r of Soc. Sec., No. 12–14621, 2014 WL 1304716, at *2

(E.D. Mich. Mar. 31, 2014) ("The absence of a review of treatment records from a treating source and the lack of analysis of such made it impossible for the ALJ to properly assess whether the Plaintiff was disabled and/or whether Plaintiff had the residual functional capacity to do any work.").

### D. Franks' Statement of Errors

#### 1. The ALJ Erred in Rejecting the Evaluation of Psychological Examiner Bonnie L. Atkinson.

Franks contends that the ALJ erred by giving "little weight" to the report of psychological examiner Dr. Bonnie L. Atkinson ("Dr. Atkinson") because it "is not consistent with the mental health center records where [Franks] has received long-term treatment[.]" (Doc. No. 17, pp. 17–21; A.R. 47.) Specifically, Franks claims that "the ALJ's conclusion that Dr. Atkinson's assessment is inconsistent with the evidence of the record is not explained with enough detail to allow Plaintiff or subsequent reviewers to follow the adjudicator's reasoning as required by SSR 06-03p." (A.R. 21.) Pursuant to SSR 06-03p, the ALJ must consider the following factors in weighing the medical opinions:

1. The examining relationship between the individual and the "acceptable medical source";
2. The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
3. The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
4. How consistent the medical opinion is with the record as a whole;
5. Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and

6. Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion.

In evaluating the factors outlined by SSR 06-03p, Dr. Atkinson's mental health specialty (A.R. 434) and her performance of a mental status exam on Franks (id. at 436) support according her opinion weight. However, the other factors do not support according her opinion great weight. The first and second factors weigh against Dr. Atkinson, because she was not Franks' treating physician; she only evaluated Franks in connection with the instant claim. (Id. at 434.) Moreover, the fourth factor—the degree to which she "presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings"—has little weight because she performed no tests on Franks. (Id. at 437.) The ALJ alluded to these, as well as the fourth factor—the consistency of Atkinson's medical opinion with the record as a whole— by noting that Dr. Atkinson's assessment that Franks was "seriously mentally ill" "is not consistent with mental health center records where the claimant has received long-term treatment[.]" (AR 47.)

In so finding, the ALJ followed the "treating physician rule" which requires

> the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." . . . The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." . . . In all cases, the treating physician's opinion is entitled to great deference even if not controlling.

Gentry, 741 F.3d at 723 (internal citations omitted). As Commissioner notes, Franks' medical records from treating mental health providers show that his "impairment required more aggressive treatment in the past than he received during the relevant time period" and "GAF scores indicate that Plaintiff had moderate mental impairment and not serious mental

11

impairment." (Doc. No. 19, p. 10.) The ALJ also specifically explained that Franks "contradicts Dr. Atkinson's opinion by his own actions" and cited his continued job searches and his ability to live alone and case for himself and a significant other. (Id.) Given the balance of the factors outlined by SSR 06-03p, the treating physician rule, and the ALJ's references to Frank's longitudinal treatment history and own actions, the Court cannot conclude that the ALJ's failure to accord great weight to Dr. Atkinson and explanation of same constitutes reversible error.

## 2. The ALJ Erred by Conferring Insufficient Weight to Franks' Testimony.

Franks claims that the ALJ erred by giving insufficient weight to Franks' testimony regarding his limitations and ability to work. (Doc. No. 17, p. 23.) Franks claims that this violates SSR 96-7p which states that,

> It is not sufficient for the adjudicator to make a single, conclusory statement that the 'individual's allegations . . . are not credible.' . . . The determination . . . must contain specific reasons for the finding on credibility supported by the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight.

(Id. at 22.) More specifically, Franks claims that the ALJ (1) "only found Franks has these [psychological] problems when he is not medication compliant" without referencing evidence of same; (2) used Franks' ability to maintain treatment for mental illness as an indication of his ability to maintain gainful employment; and (3) put misplaced reliance on the report of vocational rehabilitation specialist who found that Franks would not qualify for any occupations. (Id. at 23.)

First, the ALJ failed to specifically cite Franks' instances of medication non-compliance in the determination that "some of the problem may be his often limited compliance with medication instructions." (A.R. 47.) However, this is not reversible error under SSR 96-7p because, in the preceding paragraphs, the ALJ detailed Franks' chronological mental health history based on his records and specifically mentioned periods in which the record indicated Franks was neither seeking nor receiving medical treatment and discontinued medication on his own or was not taking medication at all. (Id. at 46.) Moreover, the Commissioner observes that this Court has previously considered a claimant's inconsistency in taking prescribed medications and gaps in treatment in determining that he or she is not credible. (Doc. No. 19, p. 6 (citing Ranellucci v. Astrue, No. 3:11-cv-00640, *10 (M.D. Tenn. Sept. 27, 2012).) Additionally, Franks' compliance with medication instructions was only one of a number of other factors—including his ability to care for himself and others and vocational assessments conducted by a vocational rehabilitation service—that the ALJ considered in reaching Franks' credibility determination. (Id. (citing A.R. 47–48).)

Second, Franks misconstrues the ALJ's references to his day treatment program attendance as an indication that the ALJ found that Franks' ability to "maintain treatment for mental illness" indicates his ability to maintain employment. (Doc. No. 17, p. 23.) Rather the ALJ found that Franks' ability to attend "day classes three days a week . . . for two years . . . is not consistent with the inability to be persistent and maintain focus." (A.R. 48.) Moreover this was not the sole basis for the ALJ's opinion, as he also noted that the mental health treatment center and vocational rehabilitation center "listed jobs he can do." (Id.) Consequently, Franks' argument is without merit.

13

Third, Franks narrowly reads the ALJ's reliance on the report of vocational rehabilitation specialist who found that Franks would not qualify for any occupations. (Doc. No. 17, 23.) While it is true that the vocational rehabilitation service found Franks "will need some select assistance in Job Readiness to prepare for, obtain, and maintain employment" that finding is not synonymous with a disability that disqualifies Franks from all occupations under the SSA. (A.R. 408.) The vocational evaluation was "to determine potential for employment as well as future options" and it is unclear if the evaluation takes into account any medical findings at all. (Id. at 407.) However, the ALJ's determination considers a broader array of factors, including longitudinal medical records and opinions from multiple sources, and did not solely rely on the vocational evaluation. Rather, the evaluation, along with those of a state agency psychological consultant who concluded Franks could perform some occupations, were part of a constellation of factors that the ALJ considered in reaching his determination. (Id. at 48.) Consequently, there was no misplaced reliance.

### 3. The ALJ Erred by Finding that Franks Had No Difficulties in Getting Along with Co-Workers, Supervisors, and the General Public.

Franks claims that the ALJ erred by erroneously stating that Franks had no difficulties getting along with co-workers, supervisors, and the general public, although Dr. Atkinson found it would be a significant problem. (Doc. No. 17, p. 24.) Franks claimed that this was not harmless error because the vocational expert testified that an individual with these difficulties would be precluded from all work in a competitive work environment. (Id.) However, the ALJ did not find that Franks had "no difficulties getting along with co-workers, supervisors, and the general public." (Id.) In fact, the ALJ found that, while "[n]one of the records from any mental health center treatment facility shoe that he ever said he had conflicts with coworkers" Franks "should not be required to more than occasionally interact with supervisors, coworkers or the

14

general public." (Id. at 48.)  With these restrictions in place, the vocational expert concluded that Franks could perform work as a materials handler or groundskeeper. (Id. at 66.)  The vocational expert did state that Franks' disability "would preclude any work in a competitive environment" if he had "problems dealing with supervisors and coworkers on a regular and sustained basis . . . it would be less than occasionally his ability to interact." (Id. at 67.)  However, Franks has not established that his impairments create those problems and the only incident he cites was in 2000, a full 10 years before his present claim and it is unclear whether this incident involved more than occasional interactions.  As such, Franks cannot establish that it was reversible error for the ALJ to conclude that Franks could perform work with only occasional interactions.

## IV.     Conclusion

For the reasons explained above, Franks' Motion for Judgment on the Administrative Record (Docket No. 16) will be **DENIED**.  An appropriate order will be filed herewith.

_____
KEVIN H. SHARP, CHIEF JUDGE
UNITED STATES DISTRICT COURT